**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr- 00060 (JMC)** |
| **v.** | : | |
| | : | |
| **WILLIAM KEEN** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant William Keen to 60 days of incarceration and $500 in restitution.

## I.    Introduction

Defendant William Keen, a 41-year-old food service worker from Louisville, Kentucky, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Keen pleaded guilty to one count of parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 60 days of incarceration is appropriate in this case because Keen (1) Expressed his desire to "Stop the Certification" in a Facebook Live on January 5, 2021 (2) entered the Capitol through the Senate Wing Door less than four minutes after it was breached and then remained inside the Capitol for 40 minutes; (2) travelled through multiple areas inside the Capitol, including the area just outside the Speaker's Lobby; (3) did not leave the Capitol building on his own accord; and demonstrated his lack of remorse when, despite having witnessed – and filmed – the fatal shooting of a rioter inside the Capitol, he exclaimed on his video-recording immediately after exiting: "Wooh that was fun! Holy shit ladies and gentlemen!"

The Court must also consider that Keen's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Keen's crime support a sentence of incarceration in this case.

## Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary repetition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense at 1-7.

### *Keen's Role in the January 6, 2021 Attack on the Capitol*

On the morning of January 6, 2021, Keen attended the Stop the Steal rally at the Ellipse and then walked from the rally onto the restricted Capitol grounds. Keen filmed much of his walk from the rally to the Capitol grounds on his cell phone. As he approached the Capitol grounds,

Keen said he was "going to try to see how close I can get." Immediately thereafter, he walked past a row of standing bike racks linked together creating a fence, and pointed his camera at a detached bike rack lying flat on the ground next to the standing bike racks. As Keen walked past the below scene, he stated into the recording, "taking barricades down to get up to the Capitol building."



***Image 1: Screen shot from Keen's personal cell phone recording of his walk to the Capitol grounds (Exhibit 1 at 25 minutes and 14 seconds)***

Keen continued past the barricades and entered the Capitol grounds on the northern side of the west lawn through a gap in the snow fencing and bike racks. As Keen entered through the gap, he panned the camera to his left and captured bike racks that had been moved with "Area Closed" signs still attached.



*Image 2:  bike racks with "Area Closed" signs (Screen shot from Exhibit 1 at 26 minutes)*

After passing through the gap, onto the lawn of the Capitol building, Keen commented, "This area I'm at now was blocked and patriots have opened it up."

Despite seeing the barricades and acknowledging that the crowd moved them to gain entry to the Capitol grounds, Keen continued to walk closer to the Capitol building. Keen saw a large scrum involving several rioters and police officers, which he filmed (*see* Exhibit 2, a screen shot from which is shown below in Image 3:



*Image 3: crowd of rioters push Metropolitan Police officers (Screen shot from Exhibit 2 at 1 minute 18 seconds)*

Keen continued advancing towards a stairwell that lead to the Upper West Terrace while surrounded by the crowd chanting, "This is our house." Keen encouraged the advancing rioters up the steps, yelling "Go, go, go!" *See* Exhibit 3 at 5 minutes and 5 seconds. Keen then ascended the steps underneath the scaffolding with a large group of rioters. Keen and the crowd were met at the top by a small number of U.S. Capitol Police ("USCP") officers blocking their way. *See* Exhibit 3 at 5 minutes and 35 seconds. Keen turned around and exited from underneath the scaffolding and continued up the steps on the portion of the steps that was not underneath the scaffolding. *See* Exhibit 3 at 5 minutes and 50 seconds. After making it to the Upper West terrace Keen stated, "Alright, time to go inside!" *See* Exhibit 3 at 8 minutes and 28 seconds. Keen filmed as rioters advanced on the Senate Wing doors. Shortly after Keen stopped filming, rioters smashed in the Senate Wing Door windows and breached the building at approximately 2:13 p.m., as shown below in Image 4.



*Image 4: Screen shot from CCTV of initial breach at Senate Wing Door*

Keen first appeared in Capitol Police CCTV near the Senate Wing Door at approximately 2:18 p.m., smoking a cigarette and filming on his phone, merely five minutes after the violent breach of the Senate Wing Door. Keen remained in the Capitol building for approximately 40 minutes, all the while holding up a "selfie-stick" and filming the chaos as it happened.



***Image 5: Screen shot from CCTV from Senate Wing Door at 2:19 p.m. showing Keen (circled in red) holding a "selfie-stick" and smoking a cigarette***

After he entered, Keen walked towards the Crypt and made his way to the second floor of the Capitol. By approximately 2:28 p.m., Keen walked through Statuary Hall West and into the Statuary Hall Connector. Keen traveled with a large crowd through the main hallway towards the Chamber for the House of Representatives as shown below:



***Image 6: Screen shot from CCTV showing Keen (circled in red) near Upper House Doors***

Keen filmed outside the Speaker's Lobby as rioters violently banged on the doors and tried to gain entry to the House of Representatives. A small team of uniformed USCP officers moved away from the Speaker's Lobby doors as a team of USCP officers in hard gear prepared to move into the area. During the chaos, Keen yelled "Go, bust it down!" *See* Exhibit 4 at 40 seconds. As Keen yelled, he filmed as Ashli Babbitt climbed through a smashed out window that was part of the Speaker's Lobby doors and was shot and killed by a USCP officer on the other side.



***Image 7: Screenshot from Keen's video recording as Ashli Babbitt (circled in yellow) climbed through broken Speaker's Lobby window (Exhibit 4 at approximately 40 seconds)***

After the shooting, Keen remained near the police officers outside of the Speaker's Lobby for several minutes, approached Ashli Babbitt as police attempted to clear the area, and throughout filmed on his cell phone. Immediately after Ms. Babbitt was shot, police began to tell the crowd to back up. Keen ignored these commands, and rather moved closer, and kneeled near Ms. Babbitt as shown in Image 8. *See* Exhibit 5.



***Image 8: Open Source video of Keen (circled in red) kneeling near Ms. Babbitt as police
attempted to clear the area (Exhibit 5 at approximately 1 minute and 34 seconds)***

Keen was eventually directed by police officers back out to the area depicted in Image 6, above. As police officers physically directed rioters towards the exit, Keen continued filming on his cell phone and told the officers "Don't push." *Exhibit 6 at 40 seconds*. Despite being physically directed where to go by police, Keen recorded on his phone as he and the crowd of rioters had to be forcibly pushed from the building as shown in Exhibit 6 from approximately 1 minute and 10 seconds until approximately 2 minutes and 40 seconds.



***Image 9: Still Image from Keen filming violent clash between police and rioters (Exhibit #6 at approximately 2 minutes and 8 seconds)***

Finally, at approximately 2:57 p.m. – 40 minutes after Keen first appeared near the Senate

Wing Door – he exited the Capitol through the East House Doors, as shown below in Image 8.



***Image 8: Screen shot from CCTV of Keen (circled in red) exiting from East House Doors***

Immediately after exiting, Keen stated into his camera held up near his face on the "selfie-stick" "Wooh that was fun! Holy shit ladies and gentlemen!"



***Image 9 Keen filming himself after leaving the Capitol (Exhibit #6 at 2 minutes and 46 seconds)***

*Social Media*

Keen operated a Facebook account under the pseudonym "Parrot Nest." Shortly after the November, 2020 Presidential election, Keen made several posts and had conversations on Facebook discussing his belief that voter fraud affected the outcome. For example, on November 7, 2020 Keen shared a photo of a map of the electoral vote count showing that the election had been called for President Biden. He wrote with the photo "It's onto the courts now." Several people in the Facebook group responded and discussed their belief that voter fraud caused the outcome. Keen seemed to agree and responded to the group "Yeah, it's all just a conspiracy theory as far as they are concerned" and "They won't see what's really going on because they don't want too."

Keen also discussed plans to go to Washington, D.C. on January 6.  On January 3, 2021 Keen sent a message to a group of friends that read "I'm going to DC on the 6th it's official." On

12

January 5, 2021, Keen went "live" on Facebook with the message "1/5/20 Washington DC, Stop the Steal, Stop the Certification, Pro Trump Rally. I just got here so you are seeing it the same time I do." On January 6, 2021 another Facebook user asked Keen "How's it in DC Parrot?" and Keen responded "Nuts we made it inside the capital building." Keen messaged a group of friends on January 6, 2021 that "Police just shot and killed a girl inside the capital building" and then wrote "I have it on video[.]" Keen apparently attempted to send the video to the group and wrote "We were at the chambers door[.]"

*Keen's Non-Custodial Interviews with the FBI*

On January 15, 2021, Keen agreed to be interviewed by the FBI. Keen stated he did not know there was an event in Washington D.C. until a few days prior when he attended a protest staged outside the home of Senator Mitch McConnell. Keen stated it was there he learned the Electoral Votes were being certified in D.C. on January 6, 2021. Keen drove from Kentucky to Washington D.C. and attended speeches in the downtown area on January 5, 2021. Keen said he slept in his car a few blocks from where then President Trump was scheduled to speak the next morning.

Keen admitted in the interview that as he approached the Capitol building on January 6 he saw, and was affected by, tear gas that had been deployed by police. Keen also admitted seeing an officer being assaulted by three rioters outside of the Capitol near the scaffolding; however, he claimed to have intervened by pulling on the collar of another rioter moving towards that officer, and stopping him from joining the assault. (The government is not aware of any evidence corroborating this). Keen claimed that he did not see the doors to the Capitol being breached. Keen stated he did not believe he did anything wrong by entering the Capitol because he did not personally break or steal any items and because he walked past and interacted with police officers.

During the investigation, Keen voluntarily provided the FBI with several video recordings he took on his phone during the events of January 6, 2021.

During a second interview on February 22, 2021, Keen refused to acknowledge that he said "Go, bust it down," as recorded in Exhibit 6. Keen was evasive and admitted it sounded like his voice, but said that he did not recall saying that. However, Keen acknowledged that he made the other statements on the video just before and after the shooting occurred. Keen acknowledged during this interview that he believed anyone who went in the building or damaged property had done something wrong.

*The Charges and Plea Agreement*

On December 16, 2022, the United States charged Keen by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). On January 10, 2023, law enforcement officers arrested him at at the FBI Resident Agency in New Albany Indiana. On February 27, 2023, the United States charged Keen by a four-count Information with violating the above crimes.

On July 17, 2023, pursuant to a plea agreement, Keen pleaded guilty to Count four of the Information 40 U.S.C. § 5104(e)(2)(G), charging him with a violation of parading, demonstrating, or picketing in a Capitol building. By plea agreement, Keen agreed to pay $500 in restitution to the Architect of the Capitol.

## II.   Statutory Penalties

Keen now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79

(D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## III.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 60 days of incarceration and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Keen's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Keen, the absence of violent or destructive acts is not a mitigating factor. Had Keen engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Keen's case is the fact that, even before January 6, Keen wanted to "[s]top the certification" of the Electoral College vote that was supposed to take place that day, as Keen himself announced in a January 5 Facebook Live. On January 6, moreover, Keen, after observing violence against the police attempting to guard the Capitol building, chose to advance and enter the building anyway. Keen then disregarded police barricades on the perimeter of the Capitol grounds, at one point boasting, "This area I'm at now was blocked and patriots have opened it up." Once inside, Keen traveled through several areas of the Capitol

building, including areas as sensitive as the doors leading to the Speaker's Lobby—immediately outside the House Chamber—and encouraged the rioters who were trying to break through that doorway. Keen filmed as one of the rioters was shot and killed by police as she tried to enter the Speaker's Lobby. Keen remained at the scene of this shooting, despite the fatal use of force by police protecting members of Congress during an insurrection. After the police ordered rioters to get back, Keen moved toward the injured rioter and knelt near her. After directly confronted by police, Keen then remained in the area and continued filiming the scene for several minutes. In total, Keen stayed inside the Capitol building for about 40 minutes and only left when forcibly removed by police, stating afterwards that his experience inside "was fun."

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

**B.   The History and Characteristics of Keen**

Keen is a high school graduate from the Louisville Kentucky area. At the time of January 6, 2021, Keen was homeless and living out of his car. Keen now states he has an apartment in Louisville. Keen states he has opened a small food cart business since January 6, 2021 and earns additional income driving for ride-share services.

Keen has convictions from 2010 for failing to maintain insurance and from 2015 for marijuana possession. Keen's other arrests, for theft and harassment, did not result in convictions.

**C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United*

16

*States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan). As Judge Berman-Jackson stated "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." United States v. Cronin, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

By the time Keen joined the January 6 attack on the United States Capitol, he was clear-eyed about the riot's goal: "Stop[ping] the certification" of the Electoral College vote that Congress was required to carry out that day.  Keen's conduct on January 6 itself was also troubling. Keen acknowledged toppled barricades and the restricted area as he entered on to Capitol grounds. Keen witnessed the fatal shooting of Ashli Babbitt, which occurred at 2:43 p.m.; immediately after being pushed out of the Capitol at 2:57 p.m., Keen exclaimed: "Wooh that was fun! Holy shit ladies and gentlemen!" Keen did not express remorse during his first interview with the FBI weeks later and stated he believed that he did not do anything wrong. In his second interview, Keen  was evasive about his comments outside the Speaker's Lobby, but stated he believed anyone who went in the building or damaged property had done something wrong. During his interview with the

United States Probation Office more than two years later Keen did not express remorse. A sentence of incarceration is warranted to deter him from future criminal conduct.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Keen based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Keen has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating or picketing in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C.

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

§ 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several

factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24

("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States vs. David Walls-Kaufman,* 22-cr-00216 (JMC), the defendant entered through the Rotunda doors on the East side of the building shortly after they were breached, similar to Keen, who was in the area inside the Senate Wing Door just after that area was first breached. The defendant in *Walls Kaufman* stayed in the building for approximately 30 minutes and entered the hallways and office spaces near the Speaker of the House's office suite, similar to Keen, who remained in the Capitol for approximately 40 minutes and was in the area outside of the Speaker's Lobby near the entrance to the House of Representatives.  The defendant in *Walls-Kaufman* had to be forcibly removed from the building by police officers, and so, too, did Keen. Walls-Kaufman, like Keen pled guilty to one count of violating 40 U.S.C. § 5104(e)(20(G), and this Court sentenced him to two months of incarceration. While Walls-Kaufman scuffled with members of the Metropolitan Police Department Civil Disturbance Unit who were quickly removing rioters from

the House hallways after the shooting, Keen remained in the area outside the Speaker's Lobby and filmed, despite being told to get back by police. Walls-Kaufman minimized his conduct to the FBI when interviewed, similarly Keen was evasive when questioned about encouraging rioters to bust down the doors and go, right before Ashli Babbitt was shot. Unlike Keen, Walls-Kaufman was a former Congressional committee staffer; additionally, he made his way to the offices of the Speaker of the House, where he assisted in opening a door to a conference room and then entered that room, remaining for several minutes.

In *United Stated v. Clifford Meteer,* 21-cr-00630 (CJN), the defendant entered the Capitol approximately 11 minutes after it was breached and remained in the Capitol for 31 minutes. Similar to Keen being outside the Speaker's Lobby, the defendant made it to outside the House Chamber and had to be forcibly removed from the building. Unlike Keen, the defendant in *Meteer* was untruthful to the FBI and was previously convicted of felony tampering and found in possession of firearms at the time of his arrest. The defendant in that case pled guilty to 40 U.S.C. § 5104(e)(2)(G) and was sentenced to two months incarceration.

In *United States v. Jeffrey William Hubbard,* 21-cr-00737 (CJN), the defendant entered the Capitol near the Senate Wing Door shortly after it was breached and remained in the building for approximately one hour. Similar to Keen encouraging rioters to break through into the Speaker's Lobby, the defendant in *Hubbarb*, attempted to break into the House Chamber. Similar to Keen, the defendant had to be pushed by police with batons from the building. The defendant in that case pleaded guilty to 40 U.S.C. § 5104(e)(2)(G) and the Court  sentenced the defendant to 45 days incarceration.

In *United States v. Daniel Morrissey* 21-cr-00660 (RBW), the defendant entered through Rotunda door at approximately 2:27 p.m. and spent 28 minutes inside the Capitol, walking around

chanting loudly and taking selfies. Similar to Keen, the defendant went into Statuary Hall and reached the House Main Door. The defendant in that case pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G) and was sentenced to 45 days of incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## IV.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."

*See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted

under 18 U.S.C. § 3663(a)(3), that Keen must pay $500 in restitution, which reflects in part the

role Keen played in the riot on January 6.[4] Plea Agreement at ¶ 14. As the plea agreement reflects,

the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a

figure based on loss estimates supplied by the Architect of the Capitol and other governmental

agencies as of October, 2022. *Id.* As noted above in footnote 1, the amount of damages has since

been updated by the Architect of the Capitol, USCP, and MPD. Keen's restitution payment must

be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol

and other victim entities. *See* PSR ¶ 64.

---

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Keen to 60 days of incarceration and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    s/ Kyle R. Mirabelli
Assistant United States Attorney
Capitol Siege Section
N.Y. Bar No. 5663166
601 D St. NW
Washington, D.C. 20001
Office: 202-252-7884